# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

JUAN BARNES                    *

Plaintiff                      *

v.                             *        Civil Action No. JKB-17-1057

KRISTA BILAK, *et al*.         *

Defendants                     *
                              ***

## MEMORANDUM OPINION

In response to the civil rights complaint filed against them, defendants Krista Bilak, Mahboob Ashraf, M.D., Holly Pierce, and Wexford Health Source, Inc., move for dismissal or for summary judgment. ECF 20. Plaintiff Juan Barnes opposes the motion. ECF 21. No hearing is necessary for the disposition of this case. Local Rule 105.6 (D. Md. 2016). For the reasons that follow, the motion shall be granted.

### Background

#### Claim regarding hypertension

Plaintiff, an inmate confined to North Branch Correctional Institution in Cumberland, Maryland, claims that he has hypertension that has gone untreated for three months, despite his request for a renewal of his medication. ECF 1 at p. 1. He states that neither Krista Bilak, RN, nor the medical contractor, Wexford Health Source, Inc., can dispute that his hypertension has gone untreated because he passed out and fell to the floor when he was lightheaded. *Id*. Barnes does not state when he passed out or where he was in the institution. Barnes claims that "a real live stroke is underway" if he does not receive treatment for his hypertension and he believes that the falls he has experienced were "light strokes" but does not explain why he believes this. *Id*. at p. 3.

In his first amended complaint, Barnes claims that his hypertension medication was allowed to expire, causing him injury. ECF 5. Although it is not all together clear, Barnes seems to assert that he stopped receiving care for his hypertension beginning December 17, 2016. *Id*. at p. 3.

He states that on April 12, 2017, after he was denied chronic care clinic attention for hypertension, he passed out. *Id*. at p. 3. Barnes claims that when he passed out his cellmate had to revive him and he hurt his right arm. *Id*. He further alleges he was having trouble breathing and his feet were swollen, but when Officer Seville called for medical assistance he was told that if Barnes was on his feet he would need to put in a sick call slip to be seen. *Id*. Barnes put in a sick call slip and threatened to sue if he did not receive his "metaprolol[1] pills." *Id*. at pp. 3-4. The following day he received his medication. *Id*.

On May 20, 2017, Barnes claims his hypertension medication was again stopped and he did not receive them for "13 days or more." *Id*. at p. 4. He seeks punitive and compensatory damages. *Id*.

In his second amended complaint, Barnes asserts that Holly Pierce has "neglected my serious medical needs to the fullest" and that he is "living in pain every single minute of the hour." ECF 11 at p. 2. He states that on November 29, 2017, he reported that he required emergency care because he was throwing up all of his food and liquids and that he was "underweight." *Id*. Pierce had Barnes's blood taken and a stool sample and claimed she ordered medication for him, but he did not receive it. He states that he needs hospital care because he sees "blood in my stool and my throw up." *Id*. Despite those symptoms, Barnes claims that Pierce did nothing for him and that medical staff are just waiting for his death. *Id*. He insists

---

[1] Metoprolol is a beta blocker used to treat angina, hypertension, or to treat or prevent a heart attack. *See* https://www.drugs.com/metoprolol.html (last visited May 8, 2018).

that "something is wrong" with him. He claims that when he asked Pierce to reinstate his hypertension medication, she told him his blood pressure was not high at that time. *Id.*

He further alleges that he has "not had my hypertension medication since June"[2] and that "this has happened two times in 18 months." ECF 11 at p. 8. He claims he experienced two incidents where he lost consciousness and struck his head because of the failure to provide him with medication. *Id.*

Claim regarding sleep apnea

In addition, Barnes claims that he has sleep apnea, which he describes as a serious medical condition that causes him to stop breathing when he is asleep. Barnes claims that the medical provider at Western Correctional Institution (WCI) requested a sleep study twice and both requests were denied. ECF 1 at p. 1. In his first amended complaint, Barnes claims that "Wexford Headquarters" denied two requests for sleep studies in 2014 and another request made in October of 2016 was ignored. ECF 5 at p. 2. He states that their "excuse" for denying the studies was that he should lose weight. *Id.* Barnes claims that not only does the condition present a threat to his health, it is also a problem for his cellmates who cannot sleep due to his snoring. He claims he has been assaulted by cellmates because of the condition. *Id.*

Claim regarding migraines

In his first amended complaint, Barnes adds a claim that Wexford has denied him treatment for chronic migraines. ECF 5 at p. 5. He states that on May 20, 2017, he complained about having chronic migraines to a nurse and she told him she ordered Excedrin for Barnes, but he states he never got it. *Id.*

---

[2] The second amended complaint was filed on December 14, 2017. ECF 11.

On June 18, 2017, Barnes saw another nurse[3] who also told him that Excedrin had been ordered for him, but he claims he never got anything. *Id*.

On July 1, 2017, Barnes saw the nurse again and claims she lied to him again. *Id*. He states he still has chronic migraines, but his request for an MRI of his brain has been ignored and he is being denied any treatment for his migraines. *Id*. Barnes adds that "a migraine headache is serious pain" and "the head is something they should not play with could be a tumor." *Id*.

### Claim regarding chronic pain management

Barnes claims that "Wexford Health" refuses to monitor and follow up on his "chronic pain." ECF 5 at p. 6. He states that he has not been seen for his chronic pain since January 1, 2017, which violates the policy requiring chronic care patients to receive follow-up care every 30 days. *Id*. He alleges that the sick call slips he sent in requesting treatment were thrown away and medical staff claim nothing was ever requested regarding this issue. *Id*.

Barnes further states that he has "been on every pill 3 times" and only one medication worked, but he is denied it because he was found guilty of possessing buprenorphine[4] two years ago. *Id*. He claims that he is "okay" with not receiving the one prescription but claims the medical staff are using the prior guilty finding to deny treatment all together. *Id*. Barnes takes issue with medical staff not permitting the use of "alternative treatment" and states he doesn't want to take pills if he "can't have the only pill that worked." *Id*.

In his second amended complaint, Barnes claims that Dr. Ashraf is improperly "prescribing a psychosis medication for pain called Cymbalta."[5] ECF 11 at p. 7. He claims the

---

[3] Barnes states that the nurse would not give her name when asked. ECF 5 at p. 5.

[4] Buprenorphine is an opioid sometimes described as a narcotic.
*See* https://www.drugs.com/search.php?searchterm=buprenorphine&a=1 (last visited May 8, 2018).

[5] Cymbalta is a selective serotonin and norepinephrine reuptake inhibitor anti-depressant and is used to treat major depressive disorder in adults; fibromyalgia (a chronic pain disorder); chronic muscle or joint pain such as

medication does not work, that he has a "real injury" with metal in his leg, and he has not received treatment for the pain for one year due to Holly Pierce stopping his Neurontin prescription "out of pure evil." *Id*. He further avers that Wexford Health has put him on "several psychosis medication[s]," which he claims "may have destroyed [his] stomach" and that he "may need surgery." *Id*.

In his second amended complaint, Barnes alleges that Sgt. Forney interfered with his attempts to file a medical complaint. ECF 11 at p.3. He claims he gave someone[6] a copy of a two-page complaint and Barnes was told it was given to Sgt. Forney, but Forney never gave Barnes a copy of the complaint. *Id*. Barnes claims this is a denial of access to courts and adds that Sgt. Forney "does not give ARP complaints out to tier reps" for the purpose of limiting complaints. *Id*. Barnes claims that Forney is attempting to stop inmates from accessing the courts by denying them access to the administrative remedy procedure and states that he "can get statements from every inmate in the building to do a class action." *Id*.

Barnes did not seek leave to further amend the complaint and the allegations raised in the second amended complaint involve claims that are unrelated to the claims asserted in the complaint and the amended complaint. Although leave to amend must be freely given by this Court, leave to amend may be denied where the proposed amendment would be prejudicial to the opposing party, or the moving party has acted in bad faith, or the amendment would be futile. *See Equal Rights Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010). A proposed amendment is prejudicial to the opposing party if it is belated and would change the nature of the litigation. *Id*. at 604; *see also Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987). The second

---

back pain and osteoarthritis pain; and pain caused by nerve damage. *See* https://www.drugs.com/cymbalta.html (last visited May 8, 2018).

[6] It is not clear who Barnes is referring to when he states, "I gave him a 2 page copy complaint he told me he gave it to Sgt. Forney." ECF 11 at p. 3.

5

amended complaint (ECF 11), construed as a motion to amend the complaint, shall be denied and the claims are dismissed without prejudice.

## Applicable Legal Standards

<u>Motion to Dismiss</u>

In considering the complaint in light of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

6

for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## Summary Judgment

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides in part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of

the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating

treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844.

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken); *see also Jackson v. Lightsley*, 775 F.3d 170, 179 (4th Cir. 2014) (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's

serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (refusal to evaluate transgender inmate for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm).

**Analysis**

Barnes's claim against Wexford Health Source, Inc., is one based on the doctrine of respondeat superior. He generally claims that Wexford is responsible for acts and decisions made by its employees, but points to no corporate policy or practice that has resulted in a deprivation of his constitutionally protected rights. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 F. App'x 279, 282 (4th Cir. 2009). Wexford Health Source, Inc., is entitled to dismissal of the claims against it.

Defendant Krista Bilak (n.k.a. Krista Self) states in her affidavit that she has not treated Barnes since 2016 and that her name is erroneously listed on a medical record dated July 19, 2017. ECF 20-3 at p. 2. Barnes does not dispute this allegation. ECF 21. Defendant Bilak is entitled to have the claims against her dismissed.

Barnes's claim regarding treatment of his hypertension focuses on Defendants Krista Bilak and Holly Pierce, whom he claims have failed to provide him with the medication metoprolol and allowed his hypertension to go untreated, resulting in his loss of consciousness. In his affidavit, Defendant Dr. Mahboob Ashraf states that Barnes was treated with metoprolol

tartrate 25mg on April 19, 2017, when his blood pressure was noted to be 160/80.[7] ECF 20-4 at p. 2. The medication was prescribed for a period of three months. *Id.* A medical record for July 29, 2017, indicates that Barnes was seen for a complaint of chest pain and his blood pressure was measured at 132/78; his chest pain appears to have been attributed to indigestion. ECF 20-2 at p. 54. Dr. Ashraf notes that Barnes's blood pressure was benign with a measurement of 130/70 in October of 2017. ECF 20-4 at p. 3; *see also* ECF 20-2 at p. 60. On November 3, 2017, Barnes's blood pressure was measured at 118/88. ECF 20-2 at p. 64. On January 9, 2018, it was measured at 118/68. ECF 20-2 at pp. 66- 67.

Barnes's claim regarding the alleged failure to treat his hypertension is further addressed by Defendants in a supplemental filing in support of the motion to dismiss or for summary judgment. ECF 22. Defendants state that Barnes's blood pressure was measured at benign levels on January 16, 2016; April 4, 25, and 28, 2016; May 9, 2016; June 29, 2016; July 8, 2016; August 26, 2016; October 21, 2016, December 15, 2016, and January 27, 2017. *See e.g.*, ECF 22-1 at p. 5 (120/88), p. 19 (130/70), p. 21 (128/82), p. 23 (128/82), p. 25 (136/60), p. 28 (118/62), p. 30 (130/74), p. 33 (130/74). They add that all of these evaluations occurred prior to the date Barnes claims he lost consciousness due to the failure to treat his hypertension, April 12, 2017. ECF 22.

To be clear, hypertension is a serious medical need and a failure to treat same, if done with the requisite intent, would present a colorable Eighth Amendment claim. Here, however, there is no evidence that Barnes presented with symptoms of hypertension that went ignored by Defendants. Further, there is no evidence that Barnes experienced a hypertensive crisis that went

---

[7] The American Heart Association defines hypertension stage one as systolic or upper number between 130-139 and diastolic or lower number between 80-89; stage two is 140 or higher over 90 or higher; and a hypertensive crisis is a systolic higher than 180 and/or a diastolic higher than 120. *See* http://www.heart.org/HEARTORG (last visited May 10, 2018).

11

ignored, nor is there a basis for his claim that he lost consciousness because his blood pressure was 160/80. *See* ECF 21 at p. 1. His assertion in his opposition response that defendants are waiting for him to pass out again before treating him for hypertension again is not supported by the objective medical records, which indicate that Barnes's complaints are addressed by medical staff when presented and his blood pressure is monitored regularly. Defendants Pierce and Ashraf are entitled to summary judgment in their favor on this claim.

With regard to Barnes's claim that he has sleep apnea that is not being treated properly, defendants provide verified medical records reflecting that Barnes was seen on April 11, 2014, by Peggy Mahler, RNP. ECF 20 at Ex. 1, p. 5. Mahler noted Barnes's complaint that he "wakes up frequently with a choking/gagging sensation" and that his "cellmate [says] he snores loudly." *Id*. A consultation for a sleep study was put in, but Mahler also advised Barnes he should lose weight because he was overweight. *Id*. On May 15, 2014, the collegial response to the consultation request for a sleep study was an alternative management including weight loss and exercise. *Id*. at p. 8. Barnes was advised of this decision on May 29, 2014. *Id*. at p. 11.

Barnes has not been diagnosed with sleep apnea, but presented symptoms indicating he may have the condition. "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

The decision to initially treat the condition by addressing a possible underlying cause – being overweight – is not evidence of deliberate indifference to a serious medical need. In

essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted), *overruled in part on other grounds by Farmer*, 511 U.S. at 837; *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732 (Mem.) (4th Cir. 2015). Further, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)). There are no exceptional circumstances evident on the record of this case, nor does Barnes present evidence of exceptional circumstances in his opposition. The prescribed treatment for Barnes does not shock the conscience and defendants are entitled to summary judgment in their favor on this claim.

Defendants admit there was a delay in delivering prescribed Excedrin to Barnes for his complaints of migraines, but assert that the delay was not intentional and did not cause Barnes to experience any instability in his condition as a result. Specifically, Barnes reported on May 17, 2017, that he had "serious headaches" that were not relieved through use of Tylenol or Motrin. ECF 20-2 at p. 23. When he was seen for the complaint on May 20, 2017, Breauna Baker, RN, noted that Barnes walked with a steady gait, denied blurred vision, and was breathing evenly and unlabored. *Id*. at p. 45. Barnes reported that Excedrin had helped with his headaches previously and a telephonic order from a provider for a prescription of "Excedrin 500mg-65mg"[8] was placed. The prescription was to be started that day and continue through June 20, 2017. *Id*.

On June 19, 2017, Barnes reported that he had not received the Excedrin ordered the month prior when he was again seen for complaints of headaches. ECF 20-2 at p. 25, 26, 48. At

---

[8]     Excedrin migraine contains 250mg of Acetaminophen, 250mg of Aspirin, and 65mg of therapeutically active caffeine. https://www.excedrin.com/products/migraine/ (last visited May 10, 2018).

that time Barnes did not have a headache and explained he gets them "off and on" but does not experience loss of vision or dizziness. *Id*. at p. 48. The medication was reordered by Stacie Mast, RN, who saw Barnes on June 19, 2017. *Id*. at p. 48.

On July 1, 2017, Mast wrote a report indicating that Barnes had not yet received the Excedrin ordered. ECF 20-2 at p. 50. She also noted that Barnes did not appear to be in distress. *Id*. She wrote: "will check [keep on person] stock for order and deliver if in stock" as the plan. *Id*.

On July 21, 2017, Barnes again complained he had not received medication ordered for his migraine and threatened to sue those responsible for not delivering the medication. ECF 20-2 at p. 29. He was seen for this complaint by Mast on July 27, 2017. *Id*. at p. 52. At that time Barnes was experiencing acid reflux issues, but had no active complaints of pain. *Id*. Mast renewed the order for Excedrin and added an order for over-the-counter antacid tablets. *Id*. When Barnes was seen for chest discomfort on July 29, 2017, he did not claim that he had not received the Excedrin ordered for his headaches. ECF 20-2 at p. 54.

Where there is no evidence that prison medical care providers intentionally denied care and the medical condition at issue is, at worst, one inducing mild to moderate pain treatable with over-the-counter medication, the actions do not shock the conscience or offend the principles of fairness and justice. Barnes has not provided any statement under oath indicating that he was incapacitated with migraines and, despite evident suffering, he was denied care. The claim does not state a constitutional violation and defendants are entitled to summary judgment in their favor.

Treatment of Barnes's chronic pain, developed as a legacy from being shot in the leg and suffering a fracture to his femur that required surgical repair, was made problematic when

14

Barnes was found hoarding narcotic strength medication. Barnes does not deny this occurred; rather, he appears to claim that the incident should play no role in decisions on what to prescribe for treatment of his pain because the incident occurred two years ago. *See* ECF 11 at p. 4. This court is mindful, however, that these defendants are responsible for treating a population, a great portion of whom have histories of drug abuse and other issues that make access to dangerous narcotic strength medication through unlawful means risky if not life-threatening to both inmates and correctional staff.[9] Against that backdrop, examination of the treatment protocol in place to address Barnes's chronic pain easily surpasses the sort of neglectful care that runs afoul of the Eighth Amendment.

On January 27, 2017, Barnes was seen by defendant Holly Pierce for chronic left hip pain. ECF 20-2 at p. 37-39. Pierce documented Barnes's history of a gunshot wound to the leg in 2009, causing a fractured femur that Barnes claims never healed. *Id*. at 37. At the time he was seen, Barnes claimed that the medication he was on "does nothing" for the pain. *Id*. Barnes was taking Ibuprofen and 600mg of Neurontin twice a day for the pain and, based on his statement that the medication was not working, Pierce made a decision to taper the Neurontin and discontinue the Ibuprofen. Also significant to the assessment was Barnes's state during the encounter with Pierce. Pierce noted that Barnes was slurring his words; he provided delayed

---

[9] "A staggering 80% of all offenders inside US prisons abuse drugs or alcohol, with close to 60% of them testing positive for illegal drugs at the time of their arrest. Nearly 50% of all inmates are clinically addicted." https://www.confirmbiosciences.com/knowledge/blog/5-startling-facts-drug-abuse-us-prisons/ (July 10, 2017) (last visited May 10, 2018).

"The United States of America currently has the highest incarceration rate in the world, and approximately 80% of incarcerated individuals have a history of illicit drug use. Despite institutional prohibitions, drug use continues in prison, and is associated with a range of negative outcomes. . . . Despite institutional prohibitions, drug use often continues in prison." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4793908/ (published online Jan 26, 2016) (last visited May 10, 2018).

15

responses to questions and exhibited bilateral horizontal Nystagmus,[10] and bilateral sclera injection or bloodshot eyes. *Id*. Despite Barnes's apparent altered state, he denied taking more than the prescribed doses of his medications or medications that were not his own. *Id*. In place of the Neurontin and Ibuprofen, which Barnes stated did not work, Pierce prescribed Capsaicin cream and Tylenol. After Pierce explained the decision, as well as how the Capsaicin cream works,[11] Barnes became irate, threatening legal action if she did not give him pain medication. *Id*. Pierce also ordered blood and urine tests, but the record does not reflect the results of those tests. *Id*. at p. 39.

On October 10, 2017, Barnes was seen by defendant Dr. Ashraf for his complaints of pain in his leg, hip, and lower back. ECF 20-2 at p. 60. Ashraf noted that Barnes was not being provided with Tramadol or Neurontin because of a prior note indicating that Barnes was misusing those medications. *Id*. In light of that limitation and Barnes's continued reports of chronic pain, Ashraf prescribed Cymbalta 30mg to treat Barnes's chronic pain. *Id*. Barnes's claim that this prescription is inappropriate because it is a "psychosis medication" is simply inaccurate. His disagreement with Ashraf's choice to safely treat his pain with a medication that is not amenable to abuse is not an adequate basis for an Eighth Amendment claim. Pierce and Ashraf are entitled to judgment in their favor on this claim.

## Conclusion

By separate order, which follows, defendants' motion shall be granted and judgment entered in their favor.

---

[10] Nystagmus is rapid movement of the eyes either up and down or side to side which can be caused by substance abuse. *See* https://medical-dictionary.thefreedictionary.com/nystagmus. (last visited May 10, 2018).

[11] Pierce explained that "Capsaicin cream must be applied three times per day over the entire painful area for up to six to eight weeks before optimal pain relief can be achieved." ECF 20-2 at p. 37. She encouraged him to take Tylenol for break-through pain. *Id*.

Dated this 17th day of May, 2018 .

FOR THE COURT:

_____/s/_____
James K. Bredar
Chief Judge